UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CATHERINE JOHNSON,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **XAVIER BECERRA,** *in his official capacity as Secretary of Health and Human Services*, <br><br> Defendant. | Case No. 1:22-cv-03024 (TNM) |

**MEMORANDUM OPINION**

Medicare beneficiaries with chronic, debilitating conditions have struggled to find home health agencies (HHAs) willing or able to provide them with in-home aide services. They now sue the Secretary of Health and Human Services (HHS) for his role in administering the Medicare program. Plaintiffs allege that an assortment of the Secretary's policies and practices deter the availability of aide services in violation of the Medicare statute and the Rehabilitation Act.

The Secretary moves to dismiss for lack of subject matter jurisdiction and alternatively for failure to state a claim. Because Plaintiffs lack standing to challenge the Secretary's policies, the Court lacks subject matter jurisdiction and must grant the Secretary's motion.

**I.**

**A.**

Medicare reimburses private agencies that care for eligible aged and disabled persons. The Centers for Medicare & Medicaid Services (CMS), a component of HHS, administers this health insurance program. Medicare covers some services that are provided in the home by participating home health agencies. These services include skilled nursing services, physical and

occupational therapy, and, relevant here, "part-time or intermittent services of a home health aide." 42 U.S.C. § 1395x(m)(1), (2), (4).

Home health aides "provide hands-on personal care to the beneficiary, or services that are needed to maintain the beneficiary's health, or [] facilitate treatment of the beneficiary's illness or injury." Compl. ¶ 43; *see also* C.F.R. § 409.45(b)(1). An aide might, for example, assist a beneficiary with bathing, dressing, or moving around his home. *See* Compl. ¶ 44. Aides may also provide incidental services, such as changing bed linens, personal laundry, or preparing a light meal. *See* Compl. ¶ 45; *see also* C.F.R. § 409.45(b)(4). Medicare covers up to 28 hours (or, in some cases, up to 35 hours) of aide services per week. *See* 42 U.S.C. § 1395x(m).

If a beneficiary is eligible and referred to home health services, the beneficiary identifies an HHA in his area that is willing and able to accept him as a patient. To help patients decide which HHA is right for them, the Medicare statute requires the Secretary to collect care quality data from HHAs and share that data with the public. *See* 42 U.S.C. § 1395fff(b)(3)(B)(v); 42 C.F.R. § 484.245. To do so, the Secretary publishes a consumer-facing metric known as the "Quality of Patient Care Star Ratings." *See generally Fact Sheet: Quality of Patient Care Star Rating*, CMS, https://perma.cc/53Z6-LVKK. This web-based system assigns each HHA a rating ranging from one to five stars, with five stars indicating highest quality. *See id.* at 1. The Star Ratings are determined using a formula based on "seven measurements of quality." *Id*. Five track patient improvement, such as improvement in mobility or breathing. *See id.*

All HHAs reserve the right to choose which patients they serve. And an HHA need not accept Medicare at all. *See* 42 U.S.C. § 1395a(a) (providing that a beneficiary may obtain health services "*if* such institution, agency, or person undertakes to provide him such services" (emphasis added)). More, an HHA may only accept a patient when it reasonably expects that it

2

can meet the patient's needs and provide the services described in her plan of care. *See* 42 C.F.R. § 484.60(a)(1) ("Patients are accepted for treatment on the reasonable expectation that an HHA can meet the patient's medical, nursing, rehabilitative, and social needs in his or her place of residency."). And once an HHA has accepted a patient, it must provide care as described in the patient's plan of care. *See id.* § 484.60 ("Each patient must receive the home health services that are written in an individualized plan of care . . . .").

Medicare imposes other conditions of participation on HHAs. For example, an HHA is required to "arrange a safe and appropriate transfer to other care entities" if it discharges a patient. *Id.* § 484.50(d)(1). It must also accept, document, and investigate patient complaints. *See id.* § 484.50(e)(1). If CMS receives many complaints, it must survey the HHA for compliance. *See* 42 U.S.C. § 1395bbb(c)(2)(B)(ii). CMS must also conduct a standard survey of every HHA no less than once every three years. *See id.* § 1395bbb(c)(2)(A). And HHAs must meet all applicable civil rights requirements, including Section 504 of the Rehabilitation Act of 1973. *See* 42 C.F.R. § 489.10.

Under the Medicare statute, the Secretary has the "duty and responsibility" to "assure" that "the enforcement of such conditions and requirements are adequate to protect the health and safety of individuals under the care of a[n] [HHA] and to promote the effective and efficient use of public moneys." *Id.* § 1395bbb(b). CMS has the concomitant responsibility to terminate agreements with HHAs that fail to comply with the conditions and requirements of participation. *See* 42 C.F.R. §§ 489.53(a)(9), 489.2(b)(3).

Because these services are not provided directly by the federal government, Medicare reimburses participating HHAs when they provide covered services. To control costs, Medicare pays HHAs prospectively for their services rather than reimbursing providers after-the-fact. This

is required by statute. *See* 42 U.S.C. § 1395fff(a). Medicare reimbursements are based on 30-day periods of home health care. *See id.* § 1395fff(b)(2)(B). To calculate payments, each period is categorized into one of 432 "case-mix" groups based on the beneficiary's specific care requirements. *See* 42 C.F.R. § 484.202. For instance, Medicare pays a higher rate for treatment of patients with certain comorbidities or for patients in a clinical grouping that has historically required more intensive care. The Secretary annually updates payment rates and policies through administrative rulemaking. *See* Compl. ¶ 58.

## B.

Now to the substance of this case. The individual Plaintiffs in this putative class action are Medicare beneficiaries with chronic, disabling conditions. *See* Compl. ¶¶ 15–17. Though Medicare covers their aide services, they have struggled to find providers willing or able to provide those services. At times, Plaintiffs have found HHAs to accept them as Medicare patients. Even then, they were not provided with the full amount or duration of aide described in their plans of care. *See, e.g.*, *id.* ¶¶ 88–90, 112. To bridge gaps, these Plaintiffs have relied on assistance from family members and privately paid aides. *See id.* ¶¶ 101, 112, 135. But self-help only goes so far. Plaintiffs suffer deteriorating health during times of intermittent care. *See id.* ¶¶ 91–99, 110–13. And, unable to obtain needed services at home, they have been forced to resort to institutional settings, such as hospitals or nursing homes, to obtain care. *See id.* ¶¶ 114–17.

Consider lead Plaintiff Catherine Johnson, who suffers from quadriplegia resulting from multiple sclerosis. *See id.* ¶¶ 81–82. Following a period of insufficient and irregular home health care, she was hospitalized in the intensive care unit. *See id.* ¶ 95. After hospitalization, Johnson had to find another Medicare-certified HHA. *See id.* ¶ 100. And although her eligibility

4

did not change, that second HHA stopped providing aide services after only 60 days.  *See id.* That same HHA, however, continued to provide other kinds of Medicare-covered home health services.  *See id.*  So Johnson again resorted to paying out-of-pocket for more aide services, even though she was under the care of an HHA.  *See id.* ¶ 101.

Joining the individual Plaintiffs in this suit are the National Multiple Sclerosis Society and Team Gleason.  *See id.* ¶¶ 18–19.  Many individuals these groups serve struggle to obtain home care services, including Medicare-covered home health aide services.  *See id.* ¶¶ 147–48, 166.  In response, these groups have diverted resources to fund private aide care for Medicare beneficiaries like Johnson.  *See id.* ¶¶ 150–59, 165–69.

Plaintiffs sued the Secretary for his role in administering Medicare's home health benefit, and later moved for class certification.  *See* Mot. to Certify Class, ECF No. 26.  First, they allege that various of the Secretary's "policies and practices . . . impede and restrict the availability and accessibility of Medicare-covered home health aide services." *Id.* ¶ 188.  This, they claim, violates the Secretary's statutory "duty to oversee and enforce the Medicare Conditions of Participation and requirements." *Id.*  Second, Plaintiffs allege that the Secretary's "policies and practices discriminate against Plaintiffs . . . on the basis of disability" in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  *Id.* ¶ 192.  They argue the Secretary is violating § 504 and its implementing regulations by administering Medicare in a way that risks unnecessary institutionalization of beneficiaries with chronic conditions.  *See id.* ¶ 193.

The Secretary now moves to dismiss all claims, *see* Mot. to Dismiss (MTD), ECF No. 21, and the Court held a hearing on that motion.  He argues that the Court lacks subject matter jurisdiction and alternatively that Plaintiffs fail to state a claim.  The Court agrees that it lacks subject matter jurisdiction and will grant the Secretary's motion to dismiss.

## II.

Before it may pass on the merits of Plaintiffs' claims, the Court must first confirm its jurisdiction over this case. Rule 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction, including lack of standing. *See Lawyers' Comm. For 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 30 (D.D.C. 2020), *aff'd,* 848 Fed. Appx. 428 (D.C. Cir. 2021). The burden is on Plaintiffs to show subject matter jurisdiction. *Id.* at 36. And because jurisdictional challenges implicate the Court's power to hear a case, "the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim." *La Botz v. FEC*, 61 F. Supp. 3d 21, 27 (D.D.C. 2014). Thus, "the court is not limited to the allegations contained in the complaint." *Id.*

The Secretary argues that Plaintiffs lack standing to challenge his administration of the Medicare program. Article III of the Constitution limits the jurisdiction of federal courts to "actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (cleaned up). This means a party must have "[s]tanding to sue." *Id.* (cleaned up). To establish standing, Plaintiffs must show they have suffered (1) an injury in fact, (2) that is fairly traceable to the challenged conduct, and (3) "likely" to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "Only one plaintiff needs standing to press each claim." *Mass. Coal. for Immigr. Reform v. DHS*, 2022 WL 3277349, at *3 (D.D.C. Aug. 11, 2022).

## III.

The Secretary argues that Plaintiffs lack standing to challenge his administration of the Medicare program. He does not dispute that Plaintiffs have alleged an injury in fact. The individual Plaintiffs have been unable to access Medicare-covered home health aide services

6

despite meeting all requirements. *See* Compl. ¶¶ 101, 112, 135. And the organizational Plaintiffs have diverted resources to help their constituents fill the void between what Medicare entitles them to and what HHAs are willing to provide. *See id.* ¶¶ 150–59, 165–71.

Instead, the Secretary contends that Plaintiffs failed to show that these injuries were caused by him or that their requested relief would redress any harm. The Court agrees that Plaintiffs have at minimum failed to plausibly allege redressability. Thus, they lack standing to sue.

### A.

The Court starts with the nature of Plaintiffs' injuries. When causation and redressability "hinge upon the independent choices of [a] regulated third party, it becomes the burden of the plaintiff to adduce facts showing that these choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (cleaned up). Thus, if "a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes substantially more difficult to establish standing." *Id.* (cleaned up).

The injuries asserted here result directly from individual, third party HHAs declining to provide Plaintiffs with Medicare-covered aide services. This happens in different ways. Some HHAs refuse at the outset to accept Medicare beneficiaries who require aide services. *See* Compl. ¶¶ 11. Others initially provide aide visits and then discontinue or reduce those services despite the beneficiary's plan of care remaining unchanged. *See id.* ¶¶ 100–01, 103, 135. What Plaintiffs have in common is that their injuries result directly from "choices made by independent actors not before the court[.]" *Lujan*, 504 U.S. at 562.

Now for Plaintiffs' theory of causation. Broadly speaking, they claim that HHAs are less likely to offer home health aide services because of the Secretary's oversight practices. *See* Opp'n at 7–11. Plaintiffs say that their injuries can be traced to the Star Rating system and audit procedures. First, the Star Rating system penalizes HHAs that provide aide services to beneficiaries with ongoing or debilitating conditions. *See* Compl. ¶ 73. It does so by rewarding providers that care for patients who show demonstrable improvements in health outcomes. *See id.* ¶ 72. So the Secretary's methodology encourages HHAs to juice their ratings by not offering aide services to beneficiaries who are not expected to recover. *See id.* ¶ 74.

Compounding Plaintiffs' troubles, the Secretary is allegedly more likely to audit HHAs that serve patients with low likelihoods of improving. Those patients often require care for longer than the average length. *See id.* ¶ 67. This "may attract Medicare reviewers' attention," causing HHAs to "los[e] time and resources addressing audits and reviews." *Id.* HHAs thus reduce the risk of costly audits by not providing aide services to patients with ongoing illness altogether.

To bolster their theory of causation, Plaintiffs point to a 90% decline nationally in home health aide visits between 1998 and 2019. *See id.* ¶ 179; Tr. of Mot. Hr'g (Hr'g Tr.) at 43. They emphasize that this occurred even though Medicare's eligibility criteria for aide services have remained essentially the same. *See id.* ¶ 6. The implication of this, Plaintiffs suggest, is that the Secretary's policies must be to blame for the systemic shortage of home health aide services.

This Court need not decide whether the Secretary caused Plaintiffs' injuries. Even assuming that their injuries are caused by the Secretary's Star Rating system and enforcement of Medicare's Conditions of Participation more broadly, it is "purely speculative" that these injuries would be redressed if the Court were to grant Plaintiffs the relief they seek. *Nat'l Wrestling*

8

*Coaches Ass'n*, 366 F.3d at 938.  Plaintiffs thus lack Article III standing to bring this action.  *See U.S. Ecology, Inc v. DOI*, 231 F.3d 20, 24 (D.C. Cir. 2000) (explaining that "a deficiency on any one of the three prongs suffices to defeat standing").

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (cleaned up).  "The key word is 'likely.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).  And while the Court "must take the complaint's allegations of facts, historical or otherwise demonstrable, as true," it "treat[s] allegations that are really predictions differently." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).  "When considering any chain of allegations for standing purposes," the Court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Id.* Accordingly, when "the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury[,] . . . the plaintiff faces an uphill climb in pleading and proving redressability." *Id.* (cleaned up).

"The starting point in the redressability analysis is necessarily the relief sought." *Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 36 (D.D.C. 2017).  Plaintiffs "request[] relief that would order the Secretary to . . . ensure reasonable access to the home health aide services authorized by Medicare law, administer the home health benefit in accordance with the integration mandate, meaningfully enforce Medicare's Conditions of Participation regarding meeting patients' needs, and ensure that criteria and methods of administration used in audits and quality rating are non-discriminatory and comport with the integration mandate." Opp'n at 13; *see also* Compl. at 52–56.

Plaintiffs do little more than recite the statutory requirements that bind HHS and list outcomes they hope the agency will achieve. Plaintiffs' framing of the requested relief at such a high level of generality is a red flag that they have not met their burden to show redressability. They largely request "a generalized injunction to obey the law." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). At oral argument, the Court asked Plaintiffs to clarify what aspects of the program they are seeking to enjoin. Counsel's most specific answer was that the Court should make "reasonable modifications" to "the quality rating system and the auditing practices of the Secretary." Hr'g Tr. at 3, 5. This "would mean that the needs of people with chronic and disabling conditions would have to be taken into account in those policies and practices." *Id.* at 5. But counsel never explained what those modifications would look like.

Without knowing the specific changes that Plaintiffs want the Secretary to make, it is hard to conclude that ruling against the Secretary would make it easier for them to find willing HHAs. Put differently, when the Court is unsure of what Plaintiffs are asking it to order the Secretary to do, it necessarily cannot evaluate whether granting that relief would redress the injuries alleged. *Cf.* Fed. R. Civ. P. 65(d) (injunctive relief "must" "state its terms specifically" and "describe in reasonable detail—and not be referring to the complaint or other document—the act or acts restrained or required").

The plausibility of Plaintiffs' theory of redressability suffers from other problems. First, their theory of causation undercuts their claim that enjoining the Secretary's auditing practices would afford them relief. Plaintiffs allege that HHAs are encouraged not to provide aide services because providing such care risks more frequent audits and potential penalties. At the same time, Plaintiffs also suggest that the Secretary could help their situation by conducting *even more* audits—of both HHAs that do and do not currently provide aide services. *See* Compl. ¶ 66 ("The

Secretary does not regularly audit, review, or monitor the discrepancy between beneficiaries' service needs and the services that are actually delivered."). More generally, it is hard to see how the Secretary should ramp up enforcement of Medicare's Conditions of Participation without increasing, or at least maintaining, the current level of oversight. Plaintiffs have not explained how fewer audits would lead to increased compliance with Medicare's requirements.

Second, recall that home health aide visits have been on the decline nationally for at least two decades. But the Star Rating system did not even exist until 2015. *Fact Sheet: Quality of Patient Care Star Rating* at 1. The Court is skeptical that relief from the current formula would reverse a trend that began well before that methodology existed. *See Arpaio*, 797 F.3d at 24 (considering "logic" of redressability).

Those concerns aside, Plaintiffs have not established standing for a more basic reason. They have not shown that it is "likely, as opposed to merely speculative," that ruling against the Secretary will alleviate their difficulty in finding HHAs willing to provide aide services. *Lujan*, 504 U.S. at 561. The unavoidable fact is that HHAs are independent market participants who elect whether to accept Medicare case-by-case. *See* 42 U.S.C. § 1395a(a) (Medicare beneficiaries may obtain services from an institution "*if* such institution, agency, or person undertakes to provide him such services" (emphasis added)). Thus, meddling with the Secretary's auditing practices or Star Rating methodology would not stop HHAs from "exercising their own discretion" to refuse aide services to Plaintiffs. *West*, 845 F.3d at 1236 (cleaned up). Plaintiffs have "offered nothing but speculation that a favorable judicial decision would alter the [HHAs] independent choices on that score." *Id.* (cleaned up).

And "the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated

11

third parties that are the direct cause of the plaintiff's injuries." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938.

The Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), is instructive. There, organizations representing indigent individuals challenged an IRS decision to give favorable tax treatment to nonprofit hospitals that offered only certain services to the indigent. 426 U.S. at 28. The Court assumed that "the IRS's new policy encourages a hospital to provide fewer services to indigents than it might have under the previous policy." *Id.* at 42 n.23. Even so, the Court rejected as too speculative plaintiffs' allegation that a return to the old regime would redress their injuries. The Court explained that "it is just as plausible that the hospitals to which [plaintiffs] may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* at 43. Plaintiffs' complaint thus could not "even survive a motion to dismiss." *Id.* at 45 n.25. So too here.

This Court credits Plaintiffs' allegations that the Secretary's Star Rating methodology and enforcement of the Conditions of Participation "encourage[]" HHAs not to offer aide services to patients with chronic conditions. *Id*. at 42 n.23. But, as in *Simon*, Plaintiffs cannot carry their burden without more. "It is purely speculative whether . . . the desired exercise of the [C]ourt's remedial powers in this suit would result in the availability to [Plaintiffs] of such services." *Id.* at 42–43. As we will see, even if the Secretary's practices "provided some encouragement" to those HHAs that decided not to provide covered aide services, it is just as plausible those providers would make the same decision given other market forces. *Arpaio*, 979 F.3d at 21.

12

Indeed, the D.C. Circuit has explained that there are "circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). That reasoning applies here.

Consider the "economic . . . realities" of Medicare's reimbursement scheme. *Arpaio*, 979 F.3d at 21. HHAs are compensated prospectively based on the expected cost of care rather than retrospectively based on actual cost. *See* Compl. ¶¶ 57–59. This is mandated by statute, which Plaintiffs do not challenge. *See* 42 U.S.C. § 1395fff. More importantly, aide services are reimbursed at a fixed rate based on the beneficiary's expected care needs. *See* Compl. ¶ 58. The rates, which Plaintiffs also do not challenge, are updated annually through notice and comment rulemaking. *See id.*

Of course, the prospective nature and rate of reimbursement no doubt factors, likely quite heavily, in an HHA's business decision whether to accept a Medicare beneficiary. Plaintiffs themselves suggest that these realities drive HHAs not to offer the services they seek. *See* Opp'n at 24 (arguing that "[t]he Secretary . . has authority to use the rulemaking process to ensure that payment methods and criteria do not deprive Plaintiffs of the aide services" sought).

More, the Court takes judicial notice of the ongoing shortage of home health care workers.[1] *See, e.g.*, *Arpaio*, 797 F.3d at 21–22 (examining redressability given other market

---

[1] "[A] court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) (cleaned up). The nationwide shortage of home health care workers has been well documented. *See, e.g.*, Christopher Rowland, *Seniors Are Stuck at Home Alone as Health Aides Flee for Higher-Paying Jobs*, The Washington Post (Sept. 22, 2022), https://perma.cc/3D69-UVJX.

forces); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007) (explaining that at the motion to dismiss stage, courts should consider "obvious alternative explanation[s]"). Plaintiffs do not dispute this fact. *See* Hr'g Tr. at 11. Though by no means dispositive, this too magnifies the speculative nature of Plaintiffs' claim that this Court can remedy their inability to obtain aide services.

In sum, Plaintiffs have alleged no facts suggesting that it is "likely, as opposed to merely speculative," that HHAs would behave any differently with respect to aide services if they prevail. *Lujan*, 504 U.S. at 561. While the Secretary's policies might have contributed to an HHA's decision not to provide aide services, so, too, might Medicare's reimbursement scheme and labor market. Plaintiffs concede that the shortage of aide care is longstanding, that it is "a complex situation," and that "[t]here are multiple factors at work." Hr'g Tr. at 11. And "[w]hen conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237.

**B.**

Plaintiffs' arguments to the contrary are unpersuasive. They primarily argue that "[c]ase law regarding independent third-party market participants is inapposite" because the third parties here are regulated by the Secretary. Opp'n at 12. That is, the Secretary "routinely takes actions to influence HHAs' behavior" given his "duty to administer" Medicare's home health benefit "through the[se] third parties." *Id.* at 13. According to Plaintiffs, this implies that the Secretary can necessarily regulate HHAs in a way that will address their injuries. But "one need not adopt the view that" the Secretary "is totally ineffectual to find that the likelihood of redress is too speculative." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 943. And the regulatory framework in which HHAs are situated does not vitiate Plaintiffs' burden to show their injuries are redressable.

The Supreme Court has been clear on this point. When redressability "hinge[s] on the response of [a] *regulated (or regulable)* third party to the government action or inaction," "it becomes the burden of the plaintiff to adduce facts showing that these choices have been or will be made in such manner as to . . . permit redressability of the injury." *Lujan*, 504 U.S. at 562 (emphasis added). So even though this case is about "injuries caused by *regulated* third parties," the Court may only reach the merits of Plaintiffs' claims if there is "little doubt as to . . . the likelihood of redress." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941 (emphasis added).

Plaintiffs fairly point out that the Secretary "routinely takes actions to influence HHAs' behavior." Opp'n at 13. But they have not shown the actions requested *here* would change the independent business decisions of HHAs not to accept certain patients. The prospective payment requirement, reimbursement rates, and labor market surely play into an HHAs' calculus whether to offer certain aide services. Plaintiffs "do[] not explain how" their requested relief "would interact with those and other factors affecting" HHAs' business decisions. *Arpaio*, 797 F.3d at 22. So the Court must speculate whether, for instance, tweaking the Secretary's Star Rating system or auditing practices would ultimately afford Plaintiffs any relief.

To be sure, the Court could fashion some remedy that might give Plaintiffs "better odds" of finding willing HHAs. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 939. But it cannot change HHAs' discretion under the Medicare statute to choose not to offer aide services to Plaintiffs. And "a quest for ill-defined 'better odds' is not close to what is required to satisfy the redressability prong of Article III." *Id.* Indeed, "it will often be possible to allege with some plausibility that a change in governmental policy is likely to cause other persons or institutions to modify their behavior in ways beneficial to the plaintiff." *N.W. Airlines, Inc. v. FAA*, 795 F.2d 195, 203 n.2 (D.C. Cir. 1986). If a plaintiff could meet its burden without more, "courts would

15

be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable."[2]  *Id.*

The Court credits Plaintiffs' allegations that the Secretary, at least at the margins, could do more to encourage HHAs to provide aide services.  It is understandable that they ask the Secretary to help them obtain the critical services that Medicare covers.  But Medicare functions by reimbursing private entities that choose to participate in the program.  It does not guarantee or provide health care.  Tinkering with the Secretary's oversight of the program would not change this.  Nor would it cabin HHAs' discretion to accept Medicare for only some, if any, services.  The Court is also mindful of the complex market forces, including Medicare's fixed reimbursement scheme, that impact HHAs' willingness or ability to provide certain services.

At bottom, it is purely speculative that a decision in Plaintiffs' favor would meaningfully alter the economic calculus by which HHAs determine whether to offer aide services.  "Where predictions are so uncertain," the Court is "prohibited from finding standing."  *Arpaio*, 797 F.3d at 22.

---

[2] Relying on three out-of-circuit district court decisions, Plaintiffs suggest that Article III's redressability requirement is relaxed in Medicare class actions and integration mandate cases. The Court disagrees.  Plaintiffs' lead case, *Jimmo v. Sebelius*, No. 11-cv-00017, 2011 WL 5104355, at *16 (D. Vt. Oct. 25, 2011), is inapt.  It concerned an alleged "violation of a procedural right," and only in the context of a procedural injury will "courts relax—while not wholly eliminating—the issues of imminence and redressability."  *Id.*  The Court is also unpersuaded by *Parrales v. Dudek*, No. 4:15-cv-424, 2015 WL 13373978 (N.D. Fla. Dec. 24, 2015), and *Murphy ex rel. Murphy v. Minnesota Department of Human Services*, 260 F. Supp. 3d 1084 (D. Minn. 2017).  In any event, insofar as these cases suggest that Plaintiffs can meet their burden with conclusory allegations of redressability at the pleading stage, they conflict with settled circuit and Supreme Court precedent.

## IV.

For these reasons, the Court concludes that Plaintiffs lack Article III standing and will grant the Secretary's motion to dismiss.[3]

A separate Order will issue today.

Dated: April 5, 2023                                             TREVOR N. McFADDEN, U.S.D.J.

---

[3] The Court rejects the Secretary's argument that it lacks jurisdiction over Plaintiffs' Medicare claims for failure to exhaust administrative remedies. Before obtaining judicial review of claims arising under the Medicare statute, a plaintiff must first (1) present her claim to the Secretary and (2) fully exhaust all available administrative remedies. *See Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018). Plaintiffs have adequately presented their claims, and the Court waives the exhaustion requirement. The organizations submitted letters to the Secretary that described paying for aide services for discrete amounts for specific constituents that should have been covered by Medicare. *See* Compl. ¶¶ 160, 173. The individual Plaintiffs submitted similar claims to either the Medicare contractors that handle initial determinations for their region or to a Medicare Advantage plan. *See id.* ¶¶ 102, 119, 137. And Plaintiffs allege that these letters raised broader issues about the Secretary's enforcement of the Medicare statute and its implementing regulations. *See* Hr'g Tr. at 42. The Secretary submitted such a letter from the National MS Society reflecting this. *See* MS Society Letter, Sept. 9, 2022, ECF No. 25-1. Plaintiffs thus satisfied the presentment requirement. And though they concededly did not exhaust their administrative remedies, the Court finds that waiver of exhaustion is appropriate here. Waiver is justified when a plaintiff's challenge is "collateral to his claim of entitlement and he stands to suffer irreparable harm if forced to exhaust his administrative remedies." *Ryan v. Bentsen*, 12 F.3d 245, 248 (D.C. Cir. 1993). The Secretary does not contest that Plaintiffs have made a colorable showing of irreparable harm. *See* Reply at 15–16; Hr'g Tr. at 36–37. And a claim is collateral when it is "not essentially a claim for benefits." *Turnbull v. Berryhill*, 490 F. Supp. 3d 132, 141 (D.D.C. 2020). That is true here because Plaintiffs bring programmatic challenges to the Secretary's policies and practices; they explicitly do not seek an award of benefits.